**KEAGLE, Plaintiff, v. UFFORD, Defendant.**

Municipal Court, Ashtabula.

No. 14737. Decided December 28, 1950.

Robert H. Fuller, Ashtabula, for plaintiff.
Dana R. Headley, Ashtabula, for defendant.

## OPINION

By PAULINO, J.

This is an action filed in this Court by the plaintiff, Clifford Keagle, the operator of a boat livery, against the defendant, Robert Ufford, to recover damages for the loss of a boat, anchor and anchor line, and for cost of repairs to an outboard motor used in the operation of the boat and to a lantern with which the boat was equipped.

The facts brought out at the trial were that the defendant, on the evening of August 17, 1950, rented from the plaintiff a boat equipped with an outboard motor, anchor, anchor line and lantern, and that at about the hour of 8:30 P. M. defendant with three companions set out on the waters of Lake Erie at Ashtabula, Ohio, for the purpose of engaging in fishing; that on two occasions defendant and his fishing companions took up positions inside of the breakwall which extended easterly from the entrance to Ashtabula Harbor for some distance and which breakwall was approximately one mile from shore from where the plaintiff's boat livery was located; that on three occasions they maneuvered their boat outside of the breakwall, and that on the last occasion they took up a position outside of the breakwall at a distance of approximately one and one-quarter miles from plaintiff's boat livery, their exact location, as near as could be ascertained, being about one-quarter of a mile east of the east side of the breakwall entrance to the harbor and about one-quarter of a mile out into the lake north of the breakwall.

The testimony on behalf of the defendant was that as the defendant and his companions were anchored and engaged in fishing at this last location a slight breeze sprang up, the water prior to this time being calm; that with the beginning of the breeze ripples began to form on the surface of the water; that at this time the operator of the boat and the outboard motor, Walter Peake, who claimed to have had extensive experience in the operation of outboard motors and who indicated that he had lived along the shores of Lake Erie practically all of his life and had learned to respect the character of the waters of Lake Erie, decided that they should come in with the boat.

Mr. Peake, who was seated in the stern of the boat in control of the outboard motor, testified that as soon as the surface of the water became rough, he began to come in with the boat; that he did not want to anticipate any trouble; that as he was guiding the boat in, the motor stopped; that he tried to restart it and that it sputtered, made a few revolutions and stalled again; that at the time the motor stalled the weather was bad; that the boat had taken on considerable water, the waves at that time rising over their heads; that the boat drifted to the immediate vicinity of the breakwall. He further testified as follows: "I had to find a landing place as soon as possible."

The testimony of the defendant was that, while he and his companions were seated in the boat engaged in fishing

at a position east by northeast from the harbor channel outside of the breakwall, a slight breeze sprang up and with the beginning of the breeze he and his party started back towards the breakwall; that a storm arose which in a few minutes developed with great velocity and intensity; that there was water flying through the air which reached a height of two feet over the heads of the occupants of the boat; that a darkness came up and that visibility became practically zero; that as a result of the water in the air the motor was drowned out; that the operator of the boat managed to start the motor again; that it ran for a short period of time and then stopped completely. He testified in substance: "We were drifting quite rapidly; at about the time we were able to place the oars in the oar locks, it was too late; before we knew it we were against the rocks; the boat was being bounced against the rocks; nothing more could be done; all of the men got out of the boat; we made an attempt to beach the boat on the breakwall but we could no so for the intensity of the storm."

The testimony on behalf of the defendant disclosed that, after this incident, the four fishermen remained on the shelter side of the breakwall for a period of from one to two hours before the coast guardsmen came in their boat after the storm had subsided and took the men to the coast guard station in the river channel. The men were then taken by automobile by the plaintiff to the boat livery from where they left for their homes. The evidence further disclosed that the occupants of the boat had lost all of their personal belongings and equipment as a result of this mishap.

The rebuttal testimony of the plaintiff was that on the evening in question he also had gone out into the lake to engage in fishing; that there were a number of other boats out in the lake among which were twenty-three or twenty-four boats from his livery; that while out in the Lake at about the hour of 9:30 P. M. or 10:00 P. M. he had heard thunder in the air and had observed lightning in the distance; that as the thunder and lightning approached more closely, he moved his boat inside of the breakwall; that he observed that other boats out in the lake were moving inside of the breakwall or were going into shore; that about an hour later a windstorm arose; that shortly thereafter he came in to shore and took charge of the boat livery, and kept checking the boats as they came in; that there came a time when all of his boats with the exception of one had come in; that about twenty or twenty-five minutes after the last boat had come in to shore, he noticed signals on the breakwall and immediately

notified the Coast Guard Station; that after the storm had subsided he went out to look for the boat, and returned with the outboard motor and lantern but was unable to find the boat, anchor or anchor line; that both the outboard motor and lantern were recovered in a damaged condition.

On cross examination all of the witnesses for the defense denied that they heard thunder in the sky before the storm arose. Defendant, however, did state that if it had been thundering, he could not hear it on account of the noise of the water. In regards to whether or not there had been lightning in the sky, some of the witnesses for the defense stated that they were unable to say that there was lightning in the sky, while others denied that there was any lightning. One witness for the defendant did testify that he saw lightning in the sky as they began to come in with the boat. Defendant and his witnesses testified generally that there were other boats on the lake that evening for they could see lights on the lake apparently from the other boats, but testified when asked if there were other boats on the lake at the time the storm broke that they were not paying any attention to any other boats but were more concerned with bringing their own boat in to the breakwall. When questioned on whether or not he had consulted the weather reports in the daily newspaper or if he had inquired concerning any storm warnings from the coast guard station, defendant testified that he had not done so.

The plaintiff in this action filed the short form petition alleging therein the rental of the boat and equipment, the return of the motor, full of water, requiring repairs; the return of the lantern in a damaged condition, the failure of the defendant to return the boat, anchor and anchor line, a demand upon the defendant for the return of this property, and the failure of defendant to so return the same after such demand made upon him, all of which facts were established in examination in chief.

The defendant in his answer admitted the rental of the boat equipped with the accessories described in the petition, and by way of defense stated that the property was taken from him by a sudden onset of wind and waves and was lost in the waters of Lake Erie without fault or negligence on his part, and by way of further answer defendant denied each and every allegation contained in the petition. The case was tried to the court without the intervention of a jury.

Since the within action is one filed by a bailor against a bailee to recover damages for loss of and injury to his property, the only issue involved is whether or not there has been

a violation of a duty owing plaintiff by defendant in the manner of the use of the property let to him for hire. The Ohio law in situations of this kind is that a bailee for hire owes to the bailor the duty of exercising ordinary care or due care in the use of the bailor's property.

There is an abundance of law in the State of Ohio defining this relationship. The latest pronouncement of the law is the case of **Agricultural Insurance Company v. Constantine, d. b. a. Allerton Parking, 144 Oh St 275, 29 O. O. 426, 58 N. E. 2nd 658,** decided by the Supreme Court of Ohio, on December 20, 1944.

Other decisions examined by the court which contain complete discussion of the law relating to this type of cases are the following:

**Holtz v. Kaffeman, 13 O. O. 436, 3 O Supp. 127, 28 Abs 321,** decided Jan. 21, 1939.

**Farm Bureau Mutual Automobile Insurance Co. v. The Alms & Doepke Co., 30 O. O. 387, 75 Oh Ap 88, 61 N. E. 2nd 224,** decided Oct. 16, 1944.

These cases contain not only the general rule of law in connection with bailments for hire, but also contain a discussion of the rules relating to the establishment of a prima facie case, the presumption of negligence, the burden of proof and the burden of proceeding with the evidence, and also define the rules of pleadings in cases of this nature.

Since this case was submitted to the court on all of the proof presented at the trial, the only question involved was whether or not the plaintiff had made out a case against the defendant. At the close of plaintiff's testimony in chief the court was not required to decide whether or not the plaintiff had established a prima facie case. Neither was the court required to decide at the close of defendant's testimony if defendant had established a valid defense, that is: If the defendant had offered a lawful excuse or an excusable cause for failure to return the boat, anchor and anchor line, and for the damage caused to the outboard motor and lantern. Since the defendant injected in his pleadings the defense of unavoidable casualty, it became the duty of the plaintiff to establish by a greater weight of or by the preponderance of the evidence the proposition in dispute, namely: "Was the defendant guilty of negligence or of a want of due care in failing to safely return the boat and equipment to the plaintiff?"

This brings us to the question of the amount of care required of the defendant to constitute ordinary care. This question has been answered by the Supreme Court of Ohio

in the case of **Soltz v. Colony Recreation Center**, reported in **151 Oh St 503, 39 O. O. 322,** 87 N. E. 2nd 167, and decided on June 15, 1949, which decision is as follows:

"Generally, the amount of care required to constitute ordinary care, is commensurate with the danger involved. Thus, under circumstances of peculiar peril, a greater amount of care is required than where the circumstances are less perilous, because prudent and careful persons, having in view the object to be attained and the just rights of others, are, in such cases, accustomed to exercise more care than in cases less perilous. The amount of care is increased, but the standard is still the same. It is still nothing more than ordinary care under the circumstances of that particular case."

And also in the case of **Englehardt v. Philipps, 136 Oh St 73, 15 O. O. 581,** 23 N. E. 2nd 829, decided on November 22, 1939, the Supreme Court of Ohio defines legal liability for negligence as follows:

"Legal liability for negligence is based upon conduct involving unreasonable risk to another which must be established by affirmative evidence tending to show that such conduct falls below the standard represented by the conduct of reasonable men under same or similar circumstances. Moreover, in determining whether the defendant should recognize the risks which are involved in his conduct as being unreasonable, only those circumstances which the defendant perceives or should perceive at the time he acts or fails to act are to be considered. Until specific conduct involving such unreasonable risk to the plaintiff is made manifest by some evidence, there is no issue to submit to the jury."

To the amazement of this court there is no abundance of authority on the law in connection with the liability of a hirer of property for loss of or damage to such property rented to him by a liveryman. An examination for Ohio authorities in cases of loss of or injury to small watercraft fails to disclose any such decisions. There is a pronouncement of law in Ohio applicable to the within case which takes one back to the horse and buggy days. That is the case of **Pickens v. Diecker,** reported in **21 Oh St 212,** 8 Am. Rep. 55, decided by the Supreme Court of Ohio in 1871. The rule of law established by the court in that case is that a hirer of a team and buggy from a livery-stable keeper is responsible to the liveryman for his negligence resulting in damages thereto.

There is one significant element in the Pickens Case which is similar to the facts in this case. In that case while defendant's agent was leading a team of horses hitched to a buggy, one of the buggy wheels struck a stone, thereby causing some paper boxes to be thrown from the wagon. This

frightened the horses and they broke away causing damage to the buggy, harness, and injury to one of the horses. The court remarked in that case that there was no claim that the horses were more liable to take fright than horses ordinarily are. The point of similarily between the two cases is that in this case there was no claim made by defendant that the storm which arose on Lake Erie that evening was more sudden, more violent, or more out of the ordinary than other storms which have arisen on the lake. On the contrary, Walter Peake, the operator of defendant's boat, testified that he had spent his whole life on the shores of Lake Erie and had learned to respect the lake. This is an indication that storms on Lake Erie are sudden, violent and frequent. Knowing these facts, can it be said that the defendant took the precautions which a reasonable or prudent person would have taken under the same and similar circumstances?

The fact that there were at least twenty-five boats on the lake that evening and all returned to shore safely with the exception of defendant's boat was an indication that the defendant and his companions did not exercise the care and prudence which was exercised by the operators of the boats on the lake that evening. This was borne out by the other facts and circumstances brought out in the evidence.

There was testimony in the trial that for approximately one hour before the storm arose there was lightning and thunder in the sky which at first could be seen and heard in the distance and which kept approaching the vicinity in which defendant's boat and the other boats were located. During this time defendant and his companions were unaware of this condition. Neither were they paying any attention to the movement of the other boats, to the extent that all of the other boats had moved either inside of the breakwall or into shore without the defendant or his companions being aware of this fact. It must be remembered also that it was early in the night on a warm August day when it would not be expected that all of the boats out in the lake would be coming into shore, with the result that defendant's boat was the only small watercraft remaining on the unprotected side of the lake when the storm finally arrived.

Another pertinent fact in this case is that under the circumstances which existed, defendant and his companions anchored their boat in a position whereby the breakwall stood between them and the shore, making it very hazardous for them to be able to return to shore in the event of a sudden storm over the lake, as had actually happened on that particular evening. While all of the other boats had reached

shore safely, the breakwall was the only place of refuge for defendant and his companions.

All of these facts clearly indicate that defendant did not exercise the ordinary care which prudent and reasonable persons would have exercised under the same and similar circumstances existing at that time on the lake. Accordingly, it is the court's opinion that the defendant was guilty of negligence in connection with the use of plaintiff's property, and is liable to the plaintiff for any damages he may have suffered as a result thereof.

The undisputed testimony of the plaintiff was that the reasonable market value of the boat, a Lyman Built Clinker Type Boat, was $175.00, and that the reasonable market value of the anchor and anchor line was $2.00; and that the fair market value of services in repairing the outboard motor was $7.00 and of the lantern $1.05, making a total of $185.05. Accordingly, the court is making a finding in favor of the plaintiff against the defendant for the sum of $185.05.